

U.S. Department of Justice

*United States Attorney*
*District of New Jersey*

---

*970 Broad Street, Suite 700  (973) 645-2878*
*Newark, NJ 07102*

July 12, 2005

<u>VIA HAND DELIVERY</u>
The Honorable Faith S. Hochberg
United States District Court
  for the District of New Jersey
U.S. Post Office & Courthouse
Federal Square
Newark, NJ 07102

> **Re:    <u>United States v. Antonia Jimenez-Calderon, Crim. No. 02-553</u>**

Dear Judge Hochberg:

Please accept this letter brief in lieu of a more formal submission summarizing the United States' position as to the appropriate sentence to be imposed on Defendant Antonia Jimenez-Calderon.  **Jimenez-Calderon is currently scheduled for resentencing before Your Honor on Tuesday, July 19, 2005, at 11:00 a.m**.

As set forth below, although the Third Circuit vacated the sentence in this case and remanded for resentencing in light of <u>United States v. Booker</u>, 125 S. Ct. 738 (2005), this Court may and should impose the same sentence under the advisory Guidelines it did before, because that sentence was within the Guidelines range correctly calculated by this Court, and otherwise satisfies the criteria enumerated in 18 U.S.C. § 3553(a).

I.    <u>Procedural History</u>

On January 17, 2003, Jimenez-Calderon pled guilty to Counts One and Fourteen of a twenty-six count Indictment.  Count One charged Jimenez-Calderon with conspiracy to provide labor and services of underage Mexican girls by threats of serious harm and physical restraint, contrary to 18 U.S.C. § 1589, and to recruit, harbor, transport, and provide underage girls, knowing that force, fraud, and coercion would be used to cause the girls to engage in commercial sex acts, contrary to 18 U.S.C. § 1591(a).  Count Fourteen charged Jimenez-Calderon with sex trafficking by force, fraud, or coercion, in violation of 18 U.S.C. §§ 1591(a)(1) and 2.

On August 7, 2003, this Court sentenced Jimenez-Calderon to a term of imprisonment of

Hon. Judge Hochberg
July 12, 2005
Page 2

210 months, a term of supervised release of five years, and a fine of $5,000.  Jimenez-Calderon subsequently appealed her sentence on three Guidelines-related grounds and requested resentencing under Booker.  In a judgment issued on June 27, 2005, the United States Court of Appeals for the Third Circuit vacated the sentence and remanded the matter to this Court for resentencing in light of Booker.

        In remanding for resentencing under Booker, the Third Circuit did not expressly criticize this Court's Guidelines calculation.  Nor should any criticism be inferred:  the Third Circuit has stated that it will vacate virtually every pre-Booker sentence on direct appeal and "remand for consideration of the appropriate sentence by the District Court in the first instance" in light of Booker, save those involving appellate waivers, alternative sentences and, presumably, mandatory minimums.  United States v. Davis, 407 F.3d 162, 165-66 (3d Cir. 2005) (en banc).  The Circuit did not opine on Jimenez-Calderon's three sentencing claims, but rather concluded "that the sentencing issues appellant raises and her challenge to her sentence under Booker are best determined by the district court in the first instance."  The Circuit enumerated Jimenez-Calderon's claims as:

        (1)        Whether the District Court erred in enhancing the offense level under U.S.S.G. § 2G1.1(b)(4)(B) for "otherwise unduly influencing a minor to engage in a commercial sex act" on the ground that such conduct was incorporated into the base offense level calculation under U.S.S.G. § 2G1.1(b)(1);

        (2)        Whether the District Court erred in applying a two-level vulnerable victim enhancement pursuant to U.S.S.G. § 3A1.1; and

        (3)        Whether the District Court erred in determining that Defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive pursuant to U.S.S.G. § 3B1.1.

II.        Remand for Resentencing Under Booker

        As this Court is well aware, in the remedial portion of the Booker opinion, the Supreme Court emphasized that district courts, while not bound to apply the Guidelines, must consult the Guidelines and take them into account when sentencing, thus requiring courts to make factual findings by a preponderance of the evidence and the legal determinations necessary to calculate a defendant's Guidelines range.  Booker, 125 S. Ct. at 757, 764, 767.  Indeed, the remedial opinion specifically rejected the "jury trial" requirement advanced by Justice Stevens in dissent, which "would change the Guidelines by preventing the sentencing court from increasing a sentence on the basis of a fact that the jury did not find (or that the offender did not admit)."  Booker, 125 S. Ct at 757-64.

        All the Courts of Appeals, following Booker, have agreed.  For example, in holding that Booker did not apply retroactively on collateral review, this Court observed that under Booker,

Hon. Judge Hochberg
July 12, 2005
Page 3

"defendants' [pre-Booker] sentences 'would be determined in the same way if they were
sentenced today; the only change would be the degree of flexibility judges will enjoy in
applying the guideline system.'"  Lloyd v. United States, 407 F.3d 608, 615 (3d Cir. 2005)
(quoting McReynolds v. United States, 397 F.3d 479, 481 (7th Cir. 2005), cert. denied, __ S. Ct.
__, 2005 WL 1105026 (U.S. June 6, 2005) (No. 04-9994)).

      Similarly, every Court of Appeals to have reached the issue has ruled that Booker "held
that decisions about sentencing factors will continue to be made by judges, on the preponderance
of the evidence," McReynolds, 397 F.3d at 481, and that the "Guideline range should be
determined in the same manner as before," United States v. Mares, 402 F.3d 511, 518 (5th Cir.
2005) ("Booker contemplates that, with the mandatory use of the Guidelines excised, the Sixth
Amendment will not impede a sentencing judge from finding all facts relevant to sentencing....
The sentencing judge is entitled to find by a preponderance of the evidence all the facts relevant
to the determination of a Guideline sentencing range ....") (internal citations omitted), petition for
cert. filed, No. 04-9517 (U.S. Mar. 1, 2005).[1]

---

    [1]  Accord United States v. Bermudez, 407 F.3d 536, 545 (1st Cir. 2005) ("the error under
Booker is not that a judge (by a preponderance of the evidence) determined facts under the
Guidelines which increased a sentence beyond that authorized by the jury verdict ...; the error is
only that the judge did so in a mandatory Guidelines system.") (internal citation omitted); United
States v. Gonzales, 407 F.3d 118, 125 (2d Cir. 2005) (rejecting approaches that "would
straightjacket a district court in exercising its authority – that endures post-Booker – to resolve
disputed facts by a preponderance of the evidence when arriving at a Guidelines sentence."); 
United States v. White, 405 F.3d 208, 219 (4th Cir. 2005) ("after Booker, a district court will
calculate, consult, and take into account *the exact same guideline range* that it would have
applied under the pre-Booker mandatory guidelines regime.") (emphasis in original); United
States v. McKinney, 406 F.3d 744, 746-747 (5th Cir. 2005) ("Booker not only allows a district
court to find facts and calculate guidelines ranges, but *requires* a court to calculate and consider
them") (emphasis in original); United States v. Yagar, 404 F.3d 967, 971 (6th Cir. 2005) (post-
Booker findings on Guidelines enhancements "must be based on reliable information and a
preponderance of the evidence"); United States v. Lee, 399 F.3d 864, 866 (7th Cir. 2005) ("the
upshot of [Booker] is to increase district judges' sentencing discretion rather than reallocate any
issue from judge to jury, change the burden of persuasion, or limit sentences to those that can be
supported solely by the facts found by the jury."); United States v. Haack, 403 F.3d 997, 1003
(8th Cir. 2005) ("[i]n determining the appropriate guidelines sentencing range ..., we see nothing
in Booker that would require the court to determine the sentence in any manner other than the
way the sentence would have been determined pre-Booker."); United States v. Dalton, __ F.3d _
, 2005 WL 1283850, *3 (10th Cir. June 1, 2005) ("Booker ... does not render judicial fact-finding
by a preponderance of the evidence *per se* unconstitutional.  The remedial portion of Booker
demonstrates that such fact-finding is unconstitutional only when it operates to increase a
defendant's sentence *mandatorily*.") (emphasis in original); United States v. Crawford, 407 F.3d

Hon. Judge Hochberg
July 12, 2005
Page 4

In determining the sentence to be imposed on Jimenez-Calderon, this Court should therefore consider the provisions of the Guidelines as applied to the facts of this case and rule on any disputed Guidelines issues. The Court then has the authority to impose any sentence that is reasonable under all of the factors in 18 U.S.C. § 3553(a), up to the forty-year maximum statutory penalty provided for the offenses to which Jimenez-Calderon pled guilty.[2] See 18 U.S.C. § 1591(b)(2). In making that determination, this Court should give considerable weight to the Guidelines range recommended by the Probation Department in the Presentence Investigation Report ("PSR").

Jimenez-Calderon argues that because she committed her offense before Booker, the ex post facto clause would prevent the imposition of a sentence in excess of the top of the advisory Guideline range. Jimenez-Calderon's creative argument is misplaced, however, because the ex post facto clause does not apply to judicial decisionmaking. See Rogers v. Tennessee, 532 U.S. 451, 462 (2001) (it "has long been settled by the constitutional text and our own decisions[] that the Ex Post Facto Clause does not apply to judicial decisionmaking."). Jimenez-Calderon's ex post facto/due process argument also fails because she essentially argues that Booker has deprived her of a right which she never had – to be sentenced to the "maximum" of 108 months (based upon the enhancements to which she stipulated in her plea agreement). However, the U.S. Code provided Jimenez-Calderon with fair warning at the time she committed her sex trafficking offense that a sentence up to the forty-year statutory maximum was a potential consequence of her actions. Jimenez-Calderon's argument has been rejected by the courts that have addressed it. See United States v. Scroggins, 2005 WL 1475303 (5th Cir. June 10, 2005); United States v. Duncan, 400 F.3d 1297 (11th Cir. 2005); United States v. Gray, 362 F.Supp. 2d 714 (S.D. W. Va. 2005). Finally, Booker did not implicitly or explicitly establish such a one-way ratchet which would provide defendants with the ability to obtain lower, but not higher, sentences upon remand. Therefore, Jimenez-Calderon "picked her poison" by requesting remand for resentencing under Booker.

In any event, in this case, the sentencing range determined through the application of the Guidelines should yield a reasonable sentence. The United States urges the Court to impose the same sentence as it did in the first instance – at the top-end of Jimenez-Calderon's properly-

---

1174, 1178-1179 (11th Cir. 2005) ("sentencing court under Booker still must consider the Guidelines, and, such consideration necessarily requires the sentencing court to calculate the Guidelines sentencing range in the same manner as before Booker.").

[2]  The § 3553(a) factors include, inter alia: the nature and circumstances of the offense and the history and characteristics of the defendant; and the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, to afford adequate deterrence, and to protect the public from further crimes of the defendant.

Hon. Judge Hochberg
July 12, 2005
Page 5

calculated Guideline range of 168 to 210 months.

III.     Calculation of Jimenez-Calderon's Guideline Range

         Establishment of the correct Guideline range is initially driven by the enhancements to which Jimenez-Calderon stipulated in her written plea agreement.  In accepting the plea, Jimenez-Calderon agreed to the following stipulations:

         1.      The applicable Guideline is § 2G1.1 which carries a base offense level of 19 because the offense involved a minor; see U.S.S.G. § 2G1.1(a)(1);

         2.      The offense involved prostitution and the use of physical force or coercion by threats, thereby justifying a four-level increase; see U.S.S.G. § 2G1.1(b)(1);

         3.      The offense involved a victim between the ages of 12 and 16 years, resulting in an increase of two levels; see U.S.S.G. § 2G1.1(b)(2);

         4.      The offense involved more than one victim, resulting in an increase of four levels; see U.S.S.G. § 2G1.1(d)(1) and § 3D1.4;

         5.      Jimenez-Calderon obstructed and impeded the administration of justice by soliciting co-defendant Sergio Farfan to deliver falsified birth certificates to hide the true ages of the girls, resulting in an increase of two levels; see U.S.S.G. § 3C1.1; and

         6.      Jimenez-Calderon merited a two-level downward adjustment for acceptance of responsibility, see U.S.S.G. § 3E1.1(a).

         In addition to these adjustments, the Court should apply the three enhancements described below because they are legally correct and fully supported by the uncontested factual findings set forth in the PSR.

         A.      A Preponderance of the Evidence Supports the Finding that Jimenez-Calderon Unduly Influenced a Minor to Engage in a Commercial Sex Act.

         Jimenez-Calderon merits a two-level enhancement under U.S.S.G. § 2G1.1(b)(4)(B) because she "otherwise unduly influenced a minor to engage in a commercial sex act."  Contrary to Jimenez-Calderon's claim, the application of the § 2G1.1(b)(4)(B) enhancement does not constitute impermissible "double counting" because it punishes a separate evil that the Probation Office and this Court have not already taken into account by imposing any other adjustment. Nor does the enhancement punish behavior which was a necessary element of the offense of sex trafficking.  Rather, because Jimenez-Calderon "unduly influenced" a minor by psychologically

Hon. Judge Hochberg
July 12, 2005
Page 6

coercing the underage victims into committing sex acts, this Court may properly increase Jimenez-Calderon's base offense level by two levels based on factors different from those underlying the § 2G1.1(a)(1) enhancement for use of a minor and the § 2G1.1(b)(1)(B) enhancement because the offense involved the use of physical force, *i.e.*, beatings.

According to the plain language of the offense guideline, § 2G1.1, four separate adjustments properly address four different evils, all of which were present as specific offense characteristics in Jimenez-Calderon's offense. Jimenez-Calderon stipulated in the plea agreement to the application of three of these four adjustments under § 2G1.1: § 2G1.1(a)(1) (the offense involved a minor), § 2G1.1(b)(1) (the offense involved a commercial sex act and the use of physical force), and § 2G1.1(b)(2) (the offense involved a victim between the age of 12 and 16). In addition, this Court may properly apply § 2G1.1(b)(4)(B) because the offense also involved psychological coercion which "unduly influenced" a minor to engage in a commercial sex act.

The simultaneous application of these four adjustments does not constitute cumulative punishment for the same conduct. The Sentencing Guidelines provide that "[t]he offense level adjustments from more than one specific offense characteristic within an offense guideline are cumulative (added together) unless the guideline specifies that only the greater (or greatest) is to be used." U.S.S.G. § 1B1.1, Application Note 4. Thus, it is well-established that a district court must impose an adjustment that applies to offense conduct unless the Guidelines exclude its applicability. <u>United States v. Wong</u>, 3 F.3d 667, 671 (3d Cir. 1993); <u>see</u> <u>also</u> <u>United States v. Johnstone</u>, 107 F.3d 200, 212 (3d Cir. 1997) (sentencing court "must make all applicable, mandatory adjustments unless the Guidelines specifically exempt the particular conduct at issue." (citing U.S.S.G. § 1B1.1(b) ("Determine the base offense level and apply any appropriate specific offense characteristics contained in the particular guideline in Chapter Two."))). As the Third Circuit has noted:

> The Sentencing Commission's awareness of potential double counting issues is clearly reflected in other Guidelines provisions. Indeed, the Sentencing Guidelines are explicit when double counting is forbidden and identify the circumstances in which certain enhancements may not be applied....
>
> Because the Guidelines are explicit when two Sentencing Guideline sections may not be applied at the same time, the principle of statutory construction, "*expressio unius est exclusio alterius*," applies.... Following these principles, we conclude that the exclusion of a double counting provision in the sections involved here was by design.... Accordingly, an adjustment that clearly applies to the conduct of an offense must be imposed unless the Guidelines exclude its applicability.

<u>Wong</u>, 3 F.3d at 670-671 (internal citations and punctuation omitted).

Hon. Judge Hochberg
July 12, 2005
Page 7

Whether a sentence may be adjusted under the Guidelines is a question of legislative intent. Wong, 3 F.3d at 669-670. "As with statutory language, the plain and unambiguous language of the Sentencing Guidelines affords the best recourse for their proper interpretation." Id. at 670. Therefore, a sentencing court should follow "the clear unambiguous language of the Guidelines if there is no discernable manifestation of contrary intent." Id. The plain language of § 2G1.1 demonstrates that the Sentencing Commission intended to elevate the base offense level of a defendant who unduly influenced minor victims to engage in commercial sex acts. The fact that other portions of § 2G1.1 contain adjustments based upon minor status and the involvement of physical force, fraud, or coercion, serves only to emphasize how stringently Congress sought to punish offenses involving these separate elements. Indeed, § 2G1.1 creates a "tiered" system, whereby additional adjustments to the base offense level account for different "degrees of heinousness" reflected in Jimenez-Calderon's crime.

The Sentencing Commission has not forbidden the cumulative use of these adjustments despite the similarity of the conduct underlying each one. Rather, the only "double counting" which is expressly forbidden by the offense Guideline is that a court may only apply § 2G1.1(b)(4) if § 2G1.1(b)(3) "does not apply." U.S.S.G. § 2G1.1(b)(4). In addition, the Commentary notes that when a court imposes a two-level adjustment under § 2G1.1(b)(3), an adjustment for Abuse of Position of Trust or Use of Special Skill under § 3B1.3 cannot also apply. See U.S.S.G. § 2G1.1, Application Note 6. Thus, this graduated system of punishments explicitly takes into account the possibility of double counting in certain situations and avoids that result.

Here, Jimenez-Calderon's use of physical force was separate from, and in addition to, any psychological coercion or fraud she also perpetrated on the victims to lure them to the United States and to keep them obedient while at the brothel. Jimenez-Calderon stipulated to the application of the four-level adjustment under § 2G1.1(b)(1) because the commercial sex act involved the use of physical force – the victims were beaten in order to ensure their obedience to the rules of the brothel and their submission to sexual acts. However, Jimenez-Calderon's sex trafficking conspiracy also involved the use of psychological coercion, thereby justifying the application of § 2G1.1(b)(4)(B) for "unduly influenc[ing] a minor to engage in a commercial sex act." The brothers' false promises of love and marriage constituted a separate form of influence, not fully accounted for by the adjustment for use of physical force under § 2G1.1(b)(1). In addition, the § 2G1.1(b)(4)(A) adjustment may also be justified because the offense involved a "knowing misrepresentation of a participant's" status, i.e. Luis and Delfino represented themselves to be fiancés of the victims. U.S.S.G. § 2G1.1, Application Note 7 (enhancement under (b)(4)(A) may be triggered by misrepresentation of participant's "name, age, occupation, gender, or status...") (emphasis added). Jimenez-Calderon exploited this misrepresentation whenever she wanted to discipline the victims by having one of the brothers scold the victims into submissiveness over the telephone. Thus, this Court may properly apply multiple adjustments where Jimenez-Calderon used both "physical force" and "unduly influenced"

Hon. Judge Hochberg
July 12, 2005
Page 8

minors to engage in commercial sex acts.

In addition, the application of these multiple adjustments does not constitute impermissible double counting of factors already incorporated in the elements of the offense. Jimenez-Calderon pled guilty under the Trafficking Victims Protection Act of 2000 which provides, in part:

> (a) Whoever knowingly – (1) in or affecting interstate commerce, ... recruits, entices, harbors, transports, provides, or obtains by any means a person; or (2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1), knowing that force, fraud, or coercion, described in subsection (c)(2) will be used to cause the person to engage

in

> a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act, shall be punished as provided in subsection (b).

18 U.S.C. § 1591.  Subsection (c) of the Act provides that the term "coercion" means: "threats of serious harm to or physical restraint against any person," or "any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person."  18 U.S.C. § 1591(c)(2)(A) and (B).

Thus, the elements of the offense include some type of trafficking of a minor to engage in a commercial sex act, knowing that "force, fraud, or coercion will be used," *or* knowing that the person is less than 18 years-old.  The statute speaks only generally of "force, fraud, or coercion," and "threats" of harm or "physical restraint."  It does not require the use of "force, fraud, or coercion," much less the use of actual physical force, such as the beatings Jimenez-Calderon administered to the victims here.  Nor does the statute require the use of psychological coercion, such as the influence Jimenez-Calderon exerted over the victims, some of whom were raped, and all of whom were promised marriage and then berated by their "fiancés" to obey Jimenez-Calderon.  Therefore, the basic elements of the underlying offense do not include the specific conduct for which Jimenez-Calderon was properly punished under § 2G1.1(b)(2) and (b)(4)(B).[3]

---

[3]  In addition, the application of an additional five points for use of a minor under § 2G1.1(a)(1) (to which Jimenez-Calderon stipulated) does not "double count" the element of § 1591 that requires the trafficking of a child.  Guideline 2G1.1 applies to offenses in addition to 18 U.S.C. § 1591, some, but not all, of which involve crimes against children.  Therefore, it is necessary for § 2G1.1, as an initial matter, to provide an elevated base offense level for offenses involving minors to demonstrate Congress's intent to impose greater punishments for these more heinous offenses.  This five-point increase under § 2G1.1(a)(1) properly accounts for Jimenez-

Hon. Judge Hochberg
July 12, 2005
Page 9

Case law from the Third Circuit and other circuits supports the Government's interpretation of cumulative punishment under the Guidelines.  For example, in United States v. Johnstone, 107 F.3d 200 (3d Cir. 1997), defendant, who was convicted of the use of excessive force, contended that the district court impermissibly double counted when it applied a four-point enhancement, pursuant to § 2A2.2(b)(2)(B), to reflect that "a dangerous weapon was otherwise used," after the court had already characterized the conduct underlying the conviction as "aggravated assault," pursuant to § 2A2.2, because the offense involved a dangerous weapon. Johnstone, 107 F.3d at 211.  The Third Circuit rejected defendant's argument, finding that the specific offense characteristic enhancement for use of a dangerous weapon accounted for a different aspect of the assault than did the aggravated assault provision.  Id. at 212.  The aggravated assault provision covered any type of involvement of a dangerous weapon in an assault, whereas the specific offense characteristic enhancement accounted for the specific type of involvement of defendant's weapon.  Id.

Likewise, in United States v. Perkins, 89 F.3d 303 (6th Cir. 1996), a defendant who pled guilty to armed robbery of a pharmacy appealed the district court's application of four upward adjustments for certain specific offense characteristics pursuant to U.S.S.G. § 2B3.1(b): a six-level adjustment for possession of a firearm which was otherwise used to threaten and assault victims; a two-level adjustment for striking a victim in the head with a gun and causing bodily injury; a two-level adjustment for physically restraining victims by binding them; and a one-level adjustment for theft of controlled substances.  Perkins, 89 F.3d at 307.  The Sixth Circuit found that the district court did not err in applying all four adjustments cumulatively because each one was listed separately as a specific offense characteristic penalizing different aspects of defendant's conduct.  Id.  For example, although the conduct supporting the adjustment for otherwise using a weapon (hitting a victim with a gun) was the same conduct supporting the bodily injury adjustment, no "double counting" was present because "one increase focuses solely on the defendant's conduct and the other increase focuses on the nature and degree of harm caused by the defendant's conduct."  Id. at 310.

Here, a § 2G1.1(b)(4)(B) adjustment for undue influence and a § 2G1.1(b)(1) adjustment for use of physical force are not predicated upon the very same factors which are essential elements of the crime itself because a "generic" sex trafficking conspiracy prosecuted under 18 U.S.C. § 1591 need not exhibit either undue influence of a psychological nature, nor the involvement of physical force, i.e., beatings.  Jimenez-Calderon's offense would have been qualitatively different if she had not beaten the victims, or if she had not used the psychological coercion and emotional manipulation she did to press the victims into total subservience.  However, the factual scenario here created a different, and more monstrous, nature and degree of harm than that enumerated in the basic elements of the crime.  That Jimenez-Calderon's crime was particularly egregious does not mean that the use of multiple adjustments is impermissible.

_____

Calderon's use of a minor in violating 18 U.S.C. § 1591.

Hon. Judge Hochberg
July 12, 2005
Page 10

Thus, application of § 2G1.1(b)(4)(B) in tandem with § 2G1.1(b)(1) is correct under the plain language of § 2G1.1 and is fully consistent with the goals of the Guidelines.  See U.S.S.G., Ch. 1, Pt A, at 3 (2002) ("Congress sought proportionality in sentencing through a system that imposes appropriately different sentences for criminal conduct of differing severity.").

      B.      A Preponderance of the Evidence Supports the Finding that Jimenez-Calderon Merits a Vulnerable Victim Enhancement

This Court may properly apply a two-level vulnerable victim enhancement under U.S.S.G. § 3A1.1(b)(1) because Jimenez-Calderon knew that her four victims were vulnerable and exploited their vulnerabilities to facilitate her sex trafficking operation.  Section 3A1.1(b)(1) provides that "[i]f the defendant knew or should have known that a victim of the offense was a vulnerable victim, increase by 2 levels."  As the commentary explains, a "vulnerable victim" is a person who is a victim of the offense of conviction and any conduct for which the defendant is accountable under U.S.S.G. § 1B1.3 (relevant conduct) and "who is unusually vulnerable due to age, physical or mental condition, or *who is otherwise particularly susceptible to the criminal conduct*."  U.S.S.G. §  3A1.1, Application Note 2 (emphasis added).  Thus, the cause of the vulnerability triggering this enhancement is entirely open ended, and is not limited to "infirmities" or other, generally debilitating conditions.  United States v. Zats, 298 F.3d 182, 187-88 (3d Cir. 2001).  The Third Circuit has adopted the view of the Second Circuit that "the correct test for vulnerability calls for an examination of the individual victims' ability to avoid the crime rather than their vulnerability relative to other potential victims of the same crime."  Zats, 298 F.3d at 188 (citing United States v. McCall, 174 F.3d 47, 51 (2d Cir. 1998)).

A three-part test guides district courts in applying the enhancement: (1) was the victim particularly susceptible or vulnerable to criminal conduct?; (2) did the defendant know or should the defendant have known of this susceptibility or vulnerability?; and (3) did this vulnerability or susceptibility facilitate the defendant's crime in some manner?  United States v. Iannone, 184 F.3d 214, 219-20 (3d Cir. 1999).  This test reflects the dual purpose of § 3A1.1: (1) "to recognize the lower cost to the criminal of committing a crime against such a victim than against a victim of ordinary robustness;" and (2) "to express society's outrage at criminals who unsportingly prey on the weak, the defenseless."  United States v. Lallemand, 989 F.2d 936, 940 (7th Cir. 1993) (Posner, J.).  Applying the Third Circuit's three-step analysis here, the uncontested facts contained in the Pre-Sentence Report demonstrate that: (1) the victims were particularly susceptible or vulnerable to criminal conduct; (2) Jimenez-Calderon was aware of their vulnerability; and (3) this vulnerability facilitated the successful commission of the offense.[4]

---

    [4] Certainly, the victims' youth rendered them more susceptible to Jimenez-Calderon's criminal conduct.  However, the Government does not seek this enhancement based upon the victims' youth because an enhancement based on age is not appropriate when age is already considered in the offense guideline, as it is in § 2G1.1(b)(2)(B).  U.S.S.G. § 3A1.1, Application

Hon. Judge Hochberg
July 12, 2005
Page 11

1. The Victims Were Particularly Susceptible to the Criminal Conduct

To justify this enhancement, the Government must prove by a preponderance that at least one of the victims was particularly susceptible to the criminal conduct. Jimenez Calderon claims that she does not deserve this enhancement because her victims were not unusually vulnerable *when compared to other victims of sex trafficking crimes.* Jimenez-Calderon's theory – that a vulnerable victim must be particularly vulnerable compared to other victims of the same crime – derives primarily from her interpretation of Mann Act case law from the Ninth Circuit, not from Third Circuit case law, nor from any precedent involving the Trafficking Victims Protection Act.[5] Such an argument fails both legally, under Third Circuit precedent, and factually, based on the instant circumstances.

First, as noted above, unlike the Ninth Circuit, the Third Circuit has rejected an examination of the victims' vulnerability *relative to other potential victims of the same crime* as the "test" for vulnerability. Zats, 298 F.3d at 188. Instead, the Circuit examines the ability of the actual individual victims to avoid the defendant's crime. Id. In Zats, defendant engaged in a fraudulent medical debt collection practice in which he collected debts on behalf of physicians from patients who failed to pay their medical bills. Id. at 184. These patients were "frequently poor, facing desperate personal circumstances, and ignorant of their legal rights." Id. In addition, the patients were "severely ill, which is not surprising because Zats specialized in collecting debts from doctors." Id. at 188. In affirming the imposition of a vulnerable victim enhancement, the Third Circuit stated:

The issue in our case is whether an individual debtor's circumstances made Zats'

––––––––––––––––––

Note 2.

[5] Crimes prosecuted under the Mann Act, which proscribes the transportation of individuals across state lines for purposes of prostitution, 18 U.S.C. §§ 2421 & 2422, primarily involve victims who are merely economically vulnerable and who, consequently, voluntarily engage in sexual acts for money. See United States v. Castaneda, 239 F.3d 978, 979-983 (9th Cir. 2001) (no vulnerable victim enhancement where female victims were recruited from abroad to work in nightclub where they were groped by male customers; victims were merely economically vulnerable and not distinguishable from typical victims of a Mann Act violation); United States v. Sabatino, 943 F.2d 94, 102, 104 (1st Cir. 1991) (no vulnerable victim enhancement where defendants ran prostitution service which hired unemployed women as prostitutes who could quit at any time and were not physically coerced into committing sexual acts); but see United States v. Williams, 291 F.3d 1180, 1184, 1196 (9th Cir. 2002) (imposition of vulnerable victim enhancement affirmed where defendant pimped a 15 year-old girl whose "psychological make-up," stemming from her childhood rape and her mother's chemical dependency, made her more vulnerable than another Mann Act victim might have been).

Hon. Judge Hochberg
July 12, 2005
Page 12

> improper debt collection methods particularly likely to succeed against him or her,
> not merely whether the debtor is more vulnerable than most debtors.  There are
> some crimes to which no victims are particularly vulnerable.  For example, few
> bank tellers are particularly vulnerable to bank robbery.  There are other crimes,
> however, such as fraudulently marketing cancer remedies to cancer patients to
> which many (if not most) victims may be particularly vulnerable....
>
> Our objective is to provide extra deterrence for defendants who are
> especially likely to succeed in their criminal activities because of the vulnerability
> of their prey.  An extra dose of punishment removes the criminal's incentive to
> facilitate his crime by selecting victims against whom he actually will enjoy a high
> probability of success.... [W]e look to the individual vulnerabilities of the actual
> victims of the crime that occurred.

Id.  Thus, here, the Court should not compare the vulnerability of Jimenez-Calderon's victims to other potential victims of sex trafficking crimes, but rather should examine the vulnerability of the actual victims of this offense.

Second, even if this Court adopted Jimenez-Calderon's proposed more restrictive test for vulnerability, *i.e.* that the victims must exhibit unusual vulnerability when compared to the typical victim of such an offense, the heinous facts of this case would still support a vulnerable victim enhancement.

The Trafficking Victims Protection Act aims to prevent the trafficking of individuals, primarily "women and children," who are "disproportionately affected by poverty, the lack of access to education, chronic unemployment, discrimination, and the lack of economic opportunities in countries of origin."  22 U.S.C. § 7101(a) and (b)(4).  Congress found that these victims are typically lured through "false promises of decent working conditions at relatively good pay as nannies, maids, dancers, factory workers, restaurant workers, sales clerks, or models."  22 U.S.C. § 7101(b)(4).  In addition, the victims are often transported from their "home communities to unfamiliar destinations," rendering them even more vulnerable.  22 U.S.C. § 7101(b)(5).

Jimenez-Calderon's victims share *some* of the same qualities as the typical victim of such an offense – they were poor, uneducated, and from a foreign country.  PSR ¶45.  On the other hand, Jimenez-Calderon's victims are unlike those typically targeted in sex trafficking schemes.  Rather, Jimenez-Calderon's victims possessed multiple vulnerabilities, to a substantial degree, which made them even more susceptible to this type of crime.  For example, the girls were not lured to the United States with economic incentives, such as "false promises of decent working conditions."  22 U.S.C. § 7101(b)(4).  Rather, they were naive, sexually inexperienced, and easily and swiftly lured by emotional incentives, *i.e.*, false promises of love and marriage.  Courts have held that an emotional bond or relationship of trust which a defendant fosters with a

Hon. Judge Hochberg
July 12, 2005
Page 13

victim can render the victim unusually susceptible to criminal conduct, particularly where a promise of marriage is involved.  See United States v. Astorri, 923 F.2d 1052, 1055 (3d Cir. 1991) (vulnerable victim enhancement properly applied to defendant who perpetrated an investment fraud scheme against his girlfriend's parents who were "rendered ... unusually susceptible to Astorri's persistent requests for more investment funds.  Astorri even went so far as to promise to marry [their] daughter in order to get additional money from [the parents]."); United States v. Paneras, 222 F.3d 406, 414 (7th Cir. 2000)(affirming enhancement where defendant defrauded six women with whom he was romantically involved, having made promises to marry several of them; one was particularly vulnerable as a "recently-divorced immigrant;" another because she was "involved in a troubled marriage").[6]  Here, the victims' "relationship" with their "fiancés" made them more willing to obey Jimenez-Calderon.  In fact, Jimenez-Calderon exploited these "relationships," directing the girls to call their purported "fiancés" and to heed their instructions, all of which involved obedience to Jimenez-Calderon.

Further, two of the victims had their will broken through rape, which rendered them even more vulnerable to the sex trafficking offense.  Thus, the victims, who were either raped or embarrassed at having had sexual relations, were further isolated from family or community support.  PSR ¶46.  Courts have also applied vulnerable victim enhancements where a defendant has taken advantage of a victim's embarrassment regarding sexual behavior.  For example, in United States v. Miller, 871 F. Supp. 232 (E.D. Pa 1994), aff'd, 74 F.3d 1229 (3d Cir. 1995), the district court applied the enhancement to defendants who collected inflated credit card debts from users of telephone sex chat lines.  Defendants purposely chose this class of debtors in order to capitalize on the debtor's embarrassment, by threatening to make public the victims' use of the sex chat lines unless defendants received exorbitant payments.  Id. at 233.  Similarly, in United States v. Lallemand, 989 F.2d 936, 940 (7th Cir. 1993), the Seventh Circuit affirmed a vulnerable victim enhancement for a defendant who secretly videotaped a sexual encounter with a married gay man, then blackmailed the victim by threatening to tell the victims' family and friends about his secret homosexuality.  Lallemand, 989 F.2d at 937.  The Seventh Circuit noted that the defendant purposely targeted the victim because "[s]ecrets concerning sexual behavior are among the secrets that people often want very much to conceal."  Id. at 939.  Hence, the embarrassment and humiliation of having been raped or having had sexual relations here

---

[6] Even absent a promise of marriage, defendants who exploit the emotional vulnerability of their victims often qualify for enhancements.  See, e.g., Iannone, 184 F.3d at 220-221 (affirming vulnerable victim enhancement where Vietnam combat veteran was "particularly vulnerable" to defendant's financial scheme because victim "was more susceptible to be deluded [and] cheated by someone who represented himself to be a brother-in-arms."); United States v. Parolin, 239 F.3d 922, 927 (7th Cir. 2001) (affirming § 3A1.1 enhancement where victim of financial fraud was financially unsophisticated, recent widow who trusted defendant because defendant had handled financial affairs for her deceased husband).

Hon. Judge Hochberg
July 12, 2005
Page 14

rendered the girls more easily manipulable by Jimenez-Calderon and more willing to isolate themselves from friends and family in Mexico.

Once smuggled to the United States, the girls became even more susceptible to Jimenez-Calderon's victimization due to linguistic and cultural barriers, their lack of knowledge of the United States justice system, and the fact that they were not permitted to communicate with each other or with the customers, per Jimenez-Calderon's orders.  In addition, Jimenez-Calderon warned the girls that if they told American law enforcement authorities their true ages or circumstances, the girls would remain in jail forever.  PSR ¶30.[7]  Courts have upheld the application of vulnerable victim enhancements where immigrants have been peculiarly susceptible to crime due to a combination of factors such as their lack of language skills, illiteracy, and inexperience with American law.  See United States v. Veerapol, 312 F.3d 1128, 1132-1133 (9th Cir. 2002) (affirming § 3A1.1 enhancement for defendant convicted of involuntary servitude where victim, a poor, undocumented immigrant lacking in sophistication and knowledge of American law, faced "linguistic, educational, and cultural barriers"); United States v. Mendoza, 262 F.3d 957, 958-961 (9th Cir. 2001) (affirming vulnerable victim enhancement for defendant who posed as INS employee and sold false immigration documents; victims were frightened, in the country illegally, unfamiliar with United States immigration law, not well educated, unsophisticated, and could not speak or read English).

Here, the uncontested facts provide a credible evidentiary basis that Jimenez-Calderon's victims were "particularly susceptible to the criminal conduct" perpetrated by Jimenez-Calderon.  U.S.S.G. § 3A1.1 Application Note 2.  As such, they meet the Zats' test for vulnerability which calls for an examination of the *individual victims'* ability to avoid the crime.  Zats, 298 F.3d at 188.  Moreover, although not necessary for application of the vulnerable victim enhancement, see id., the unique combination and degree of vulnerabilities present here distinguishes these girls from the general victims Congress intended to protect in enacting the Trafficking Victims Protection Act.

### 2. Jimenez-Calderon Was Aware of Her Victims' Vulnerability

Turning to the second prong of the Iannone test, it is evident that Jimenez-Calderon was

---

[7] Jimenez-Calderon will likely contend that this Court should not consider the conditions under which the victims were enslaved in the brothel, suggesting that their mistreatment during the offense is irrelevant to their vulnerability.  However, to the extent that Jimenez-Calderon's treatment of the girls rendered them even more vulnerable, she then further manipulated that vulnerability.  See United States v. Altman, 901 F.2d 1161, 1165 (2d Cir. 1990) (affirming vulnerable victim enhancement where defendant posed as owner of modeling agency, plied women with drugs, had intercourse with them, and took sexually explicit photographs of them, because  drugging of victims rendered them "physically and mentally more vulnerable.").

Hon. Judge Hochberg
July 12, 2005
Page 15

aware of the victims' vulnerability.  Because the co-conspirators selected a particular type of victim through in-person solicitation, Jimenez-Calderon knew that the girls her brothers brought to her brothel would be particularly vulnerable.

3. The Victims' Vulnerability Facilitated Jimenez-Calderon's Crime

The third Iannone factor, whether the victims' vulnerability facilitated the crime, is satisfied where there is a direct causal connection between the vulnerability and the crime.  Zats, 298 F.3d at 186.  Here, the victims' vulnerability does not merely make them sympathetic, but it actually facilitated the crime.  There is a clear causal connection because the victims' vulnerabilities – their sexual naivete, illiteracy, distance from their families, and enslavement in a foreign country – made it much more likely that the sex trafficking conspiracy would succeed.

Accordingly, because the victims were particularly susceptible to the criminal conduct, because Jimenez-Calderon knew of their vulnerability, and because their vulnerability facilitated the sex trafficking conspiracy, this Court may properly apply a two-level enhancement pursuant to U.S.S.G. § 3A1.1(b)(1).[8]

C.     A Preponderance of the Evidence Supports the Finding that Jimenez-Calderon Merits an Enhancement for Aggravating Role

Jimenez-Calderon played an aggravating role in the sex trafficking conspiracy and, therefore, warrants a four-level upward adjustment under U.S.S.G. § 3B1.1.  A district court may increase a defendant's offense level by four levels if the defendant "was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive."  See U.S.S.G. § 3B1.1(a).  Factors that indicate whether the defendant was an organizer or leader include:

the exercise of decisionmaking authority, the nature of participation in the commission of

_____

[8] In the alternative, were this Court to find that perhaps not all four victims were vulnerable to the degree necessary to support a vulnerable victim enhancement, it could nevertheless impose the enhancement based upon the vulnerability of only one victim.  Zats, 298 F.3d at 190 (citing United States v. Smith, 133 F.3d 737, 749 (10th Cir. 1997) ("A single vulnerable victim is sufficient to support application of the enhancement.")).  Here, for example, an enhancement could be supported based upon the victim who may appear the most vulnerable – J.R.S. – who was raped prior to her arrival at the brothel, who never attended school, who could not read or write, who had never previously had a sexual relationship, and who was afraid to tell her family.  PSR ¶¶74-94.  Were Jimenez-Calderon to receive a two-level vulnerable victim enhancement only with regard to this one victim, she would still receive a total offense level of 35, triggering a Guidelines range of 168 to 210 months.

Hon. Judge Hochberg
July 12, 2005
Page 16

the offense, the recruitment of accomplices, the claimed right to a larger share of the
fruits of the crime, the degree of participation in planning or organizing the offense, the
nature and scope of the illegal activity, and the degree of control and authority exercised
over others.

U.S.S.G. § 3B1.1, Application Note 4; see also United States v. Gricco, 277 F.3d 339, 358 (3d
Cir. 2002) (citing United States v. Hunter, 52 F.3d 489, 492 (3d Cir. 1995)); United States v.
Phillips, 959 F.2d 1187, 1191 (3d Cir. 1992). "There need not be evidence of every factor,"
however, "before a defendant is found to be a 'leader or organizer.'" United States v. Ortiz, 878
F.2d 125, 127 (3d Cir. 1989).

The uncontested factual findings of the PSR establish that Jimenez-Calderon was a
"leader" or "organizer" who orchestrated the activities of at least five other participants.
Jimenez-Calderon conceived of the conspiracy with her siblings and ran the conspiracy with the
help of her sister, Librada. In addition, the sisters' criminal activity involved six other
participants: Luis, Delfino, Pedro Garcia Burgos, Farfan, Angel Ruiz, and Maritzana Diaz
Lopez.

Jimenez-Calderon and Librada ran the day-to-day activities at the brothel which included
the enslavement of the four girls and all aspects of running the prostitution business.[9] Jimenez-
Calderon made the rules, enforced the rules, and collected all the proceeds from the illegal
activity. The girls collected $35 from each customer and gave the money directly to Jimenez-
Calderon who kept approximately one-third for herself and her sister and divided the rest among
the other co-conspirators. PSR ¶¶24, 86.

Jimenez-Calderon enlisted the help of her two brothers, Luis and Delfino, in "recruiting"
young girls in restaurants in Mexico through false promises of marriage. PSR ¶20. The brothers
smuggled the girls across the border and brought them to Jimenez-Calderon at the brothel. PSR
¶20. After leaving the girls at the brothel, the brothers would continue to assist Jimenez-
Calderon, at her request, by scolding the girls over the telephone (in calls initiated by Jimenez-
Calderon) in an effort to keep the girls obedient and subservient to Jimenez-Calderon. PSR
¶¶26, 61, 72, 88, 90. In exchange, Jimenez-Calderon distributed a portion of the proceeds from
the criminal activity to her brothers. PSR ¶31.

Jimenez-Calderon's criminal activity also involved the participation of a third individual
– Burgos. Jimenez-Calderon called upon Burgos to act as an enforcer. Burgos was responsible
for reporting any "misbehavior" by the girls to Jimenez-Calderon. PSR ¶43. Jimenez-Calderon

---

[9] Although there is no doubt that Jimenez-Calderon "supervised" the activities of the
four victims, the victims cannot be considered "participants" for purposes of § 3B1.1. See
U.S.S.G. § 2G1.1, Application Note 3.

Hon. Judge Hochberg
July 12, 2005
Page 17

would then administer the discipline.  PSR ¶¶26, 43.  Although Burgos initially recruited the sisters to work in the brothel when it only offered the services of adult prostitutes, it was Burgos who, in turn, worked for the sisters, by assisting them in supervising the underage girls.  Burgos played a subsidiary role in the sex trafficking conspiracy because he had no involvement in luring the girls from Mexico.

      In addition, Jimenez-Calderon's sex trafficking conspiracy involved the participation of a fourth individual – Farfan.  After the girls were arrested and placed in the juvenile house of detention, Jimenez-Calderon recruited Farfan to deliver false birth certificates to law enforcement in an attempt to win the girls' release.  PSR ¶32-33.  The conspiracy also involved the participation of Ruiz and Lopez who provided Jimenez-Calderon with rooms in the house of prostitution in exchange for a small portion of the proceeds.  PSR ¶¶17, 44.

      Jimenez-Calderon suggests that Burgos, Ruiz, and Lopez each played a greater leadership role than she did.  This claim, however, incorrectly shifts the focus of the debate away from the sex trafficking conspiracy involving underage girls to the general activities of the house of prostitution in which adult prostitutes also worked.  Ruiz and Lopez played a subsidiary role in Jimenez-Calderon's sex trafficking conspiracy because they had no involvement in luring the girls from Mexico and did not supervise the underage girls.  PSR ¶44.  Ruiz and Lopez were, effectively, landlords, who profited from the proceeds generated by the enslaved, underage prostitutes and the free, adult prostitutes.

      Accordingly, Jimenez-Calderon organized the criminal sex trafficking activity which involved the participation of herself, Librada, Luis, Delfino, Burgos, Farfan, Ruiz, and Lopez.  See United States v. Evans, 272 F.3d 1069, 1097 (8th Cir. 2001) (evidence demonstrated that defendant who recruited a woman to work as a prostitute, hired a driver to transport a woman on prostitution calls, and participated in a meeting in five-co-defendant Mann Act prostitution ring merited "leader" or "organizer" enhancement).  It is irrelevant that Jimenez-Calderon and her sister, Librada, may have been equally culpable – both may still be deemed "organizers or leaders" of the conspiracy.  As long as both Jimenez-Calderon and Librada were organizers or leaders of a criminal activity which involved five participants in addition to themselves, the enhancement is appropriately applied to both defendants.  "There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association."  Ortiz, 878 F.2d at 127 (quoting U.S.S.G. § 3B1.1 Application Note 4); see also United States v. Bass, 54 F.3d 125, 128 (3d Cir. 1995) ("evidence that the defendant is the sole or predominant leader" is not required to find that defendant played a leadership role in an offense).

      Therefore, this Court should impose a four-level upward adjustment under U.S.S.G.

Hon. Judge Hochberg
July 12, 2005
Page 18

§ 3B1.1(a) for Jimenez-Calderon's role as an "organizer or leader."[10]

IV.    Conclusion

      Therefore, after the imposition of the three afore-mentioned sentencing enhancements, Jimenez-Calderon's properly calculated Guideline range for a total offense level of 35 and Criminal History Category I is between 168 to 210 months of imprisonment.  Although, pursuant to Booker, this Court has the discretion to sentence Jimenez-Calderon up to the statutory maximum term of forty years, the Government respectfully recommends a sentence at the top end of the properly calculated Guideline range to reflect the heinous nature of the offense and because such a sentence would be reasonable and appropriate under 18 U.S.C. § 3553(a).

      Thank you for your consideration.

                Respectfully submitted,

                CHRISTOPHER J. CHRISTIE
                United States Attorney


          By:    /s/ SABRINA G. COMIZZOLI
                Assistant U.S. Attorney


cc:    Chester M. Keller, Esq.
       First Assistant Federal Public Defender

       Susan M. Smalley
       Senior U.S. Probation Officer

---

[10] In any event, if this Court should determine that Jimenez-Calderon does not merit a four-level enhancement pursuant to § 3B1.1(a), it may, nevertheless, consider imposing an upward departure for her role in the offense.  See U.S.S.G. § 3B1.1, Application Note 2 ("An upward departure may be warranted ... in the case of a defendant who did not organize, lead, manage, or supervise another participant, but who nevertheless exercised management responsibility over the property, assets, or activities of a criminal organization.").